Good morning, your honors. May it please the court. My name is Todd Steigman. I'm here representing the plaintiff appellant, Luke Weinstein, in this appeal from the district court's decision granting summary judgment in favor of the defendant. The district court's decision granting summary judgment is wrong on the law and wrong on the facts. We're asking the court to reverse and remand this case for trial. The district court's decision did not follow established legal principles relating to the Pickering Balancing Framework the Mt. Healthy defense, and the First Amendment. The district court's decision failed to focus on the actual record of plaintiff's claim relating to the APIR position, and the record evidence relating to the APIR position is different from the record relating to the Innovation Accelerator position that was the subject of the previous decision by the district court and the previous appeal to this court. With respect to the Pickering Balancing Test, we believe that the established law relating to the Pickering Balancing Test mandates and limits that balancing test to disruption caused by the plaintiff's protected speech. In this case, Defendant Earley never claimed that any disruption was caused by the plaintiff's protected speech that's actually the subject of this appeal. So you may be right that it was puzzling that the district court here engaged in a Pickering Balancing Test because, as I understand, that was not the argument made. But why is the speech here not within the scope of Mr. Weinstein's employment as a public employee? I mean, I think that's what I'm focused on. Okay. Thank you, Your Honor. I'll be happy to address that. Mr. The plaintiff's speech occurred at multiple times. The first instance of the plaintiff's protected speech I do not believe is actually challenged. Its protected status I do not believe is actually challenged. In the district court's previous ruling we're here because of the grievance. We're here because of we're still claiming the initial protected speech as well as the nepotism complaint. Right. So in approximately May of 2010, the plaintiff raised issues that we can generically refer to as nepotism, but I think they actually amount to violations of the State Ethics Code with the Director of Compliance Rubin. And then subsequently, later that year, I believe from September and then again in November of 2010, the plaintiff reiterated those complaints relating to nepotism and also claimed that he was being retaliated against. Aren't we here on remand? I mean, I was on the initial panel. Right. And I think that we helped your cause by remanding, and it was because the district court had not addressed the grievance issue. That's correct, Your Honor. But the underlying protected speech relating to the nepotism complaint that was communicated by the plaintiff to Director of Compliance Rubin is still protected speech, and we're still claiming that the plaintiff was retaliated against by the defendant because of that protected speech as well as because of the speech made as part of the retaliation complaint in September of 2010 and November of 2010. And in the memo from Dean Klein to Dean Early, which I believe can be found at the record starting at page 1189, dated November 10, 2010, Dean Klein communicates to Dean Early that in the context of the retaliation complaint that was made through the grievance process, the plaintiff reiterated his complaints relating to nepotism. What we said was in support, Weinstein has identified as protected speech not only his nepotism comments, but also the September — and I understand that it's wrapped in, but the reason that the prior panel remanded was the September 2010 grievance that he filed after the adverse director decision, but before the assistant professor  position, to address that retaliation claim. Right. So I'll be happy to clarify, Your Honor. So the employment action that was the subject of the prior appeal was the innovation accelerator director position. That adverse employment action is no longer part of this appeal. This current appeal relates to the adverse employment action relating to the APIR position, assistant professor in residence position. And so the subject matter of this appeal is a claim that the plaintiff was retaliated against in connection with the APIR position because of his protected speech, both in May of 2010, communicating concerns about nepotism to the director of compliance, as well as his — his reiterating those complaints in the context of the employment grievance for retaliation, and communicating — The world narrower, wouldn't you agree? That is, now we view the nepotism-related comments in the — in the context or through the prism of a collective bargaining agreement grievance. With — with respect to the complaints that were — when they were reiterated in September and November of 2010, they were reiterated in connection with a retaliation complaint that was made through the grievance process. But that doesn't — Let me see if I — your — your argument is that there was a — there were — a nepotism complaint made in May, that it was two years prior to the time, approximately two years prior to the time that his contract was not renewed as an assistant professor, but you — but one of your claims is there was — that was — the non-renewal was retaliation for that May speech, and also for the labor grievance in the fall. Is that right? That's correct, Your Honor. And the — it looks like you're about to start another question, so I'll — That's correct. So going to my colleague's question, though, with regard to the labor grievance, is that really a protected speech? I mean, the labor grievance was predominantly about his personal problems at work, his desire to have a tenure-track position, and I'm having difficulty seeing why that's protected speech. So help me out. So we're only claiming that the particular content of the speech relating to — reiterating his concerns about the nepotism, and also complaining that he was retaliated against for his earlier protected speech relating to the nepotism is protected. All of the other speech that took place as part of the grievance process in the fall we're not claiming is protected. But in light of the fact that the district court previously determined that the May 2010 protected speech relating to nepotism was protected, that was not challenged by the defendant as part of the previous appeal, and I don't believe it's being challenged as part of this appeal. So the initial framework for determining whether there's protected speech here is the May 2010 complaint that I don't believe is being challenged as part of this appeal. We're also — but in addition to that, we're claiming that the repetition of that protected speech as part of the September 2010 grievance and the Step 1 hearing, which I believe was in November of 2010, the reiteration of protected speech remains protected. The fact that it takes place in the context of a retaliation complaint doesn't strip protected speech of its protected status. This is not like Weintraub. Weintraub was unprotected under Garcetti because the content of the plaintiff's speech in Weintraub related to the part and parcel, the nuts and bolts of the plaintiff's ability to do his actual job in the classroom, maintain discipline in the classroom. That was the content of the speech. Here, the content of the speech is protected. It's the same speech that happened in May of 2010 relating to the grievance. And we contend that if you make a claim that you're — make a claim that you're being retaliated against for speech that's protected by the First Amendment, that in order to further the purposes and the interests of people's rights under the First Amendment, that a claim that you're being retaliated against for exercising your rights under the First Amendment, when the underlying speech is protected under the First Amendment, also is warranting a protection. And the fact that that happened. I mean, with respect to trying to discern whether this is — whether your client was speaking as a public employee rather than a citizen, should — isn't it relevant that he use the employee grievance procedure? Would you agree with that? I would agree that the — as part of First Amendment doctrine, that the form and the content and the context is all relevant, but it's not dispositive. The fact that he didn't go through some other channel, such as writing a letter to the editor, like in Pickering, or, you know, some other, you know, agency that's way outside the scope of his chain of command or disseminating this — What can we look at besides the fact that he pursued this avenue that's reserved for employees? I — You say it's not dispositive. Okay. It's not dispositive. If you look at prior Supreme Court presidents, the Givon decision — I hope I'm pronouncing that right — dating back decades was internal employee speech, and that's still good law. The fact that an employee doesn't go outside to the public doesn't mean that internal employee speech isn't protected, and Garcetti doesn't say anything to the contrary, and neither does Weintraub. The fact that the citizen analog issue is a factor. It is not dispositive. And if I could just follow up on one moment based on an earlier question from the Court in terms of the timing. It's our understanding, and I believe the record supports this, that the decision to non-renew the plaintiff from the APIR position was made sometime prior to February 2011. The protected speech in May 2010 would be about eight or nine months from that, and the memo from Dean Kline to Dean Early, communicating to Dean Early following the Step 1 grievance in November 2010, that the plaintiff reiterated his concerns relating to nepotism and also claimed he was being retaliated against took place approximately three months before the adverse employment decision was made. I see I'm over my time, so I'll reserve the rest for rebuttal. Good morning. May it please the Court, I am Nancy A. Brouillette, Assistant Attorney General for the Defendants, University of Connecticut, and Dean Christopher Early. The district court correctly decided this case in favor of the defendants based upon the Mt. Healthy defense, but I'd like to concentrate on the alternate grounds for affirmance in this case, qualified immunity, which clearly protect the defendant early, given the state of the law at the time he made this decision. And just to, does this mean that you're not relying on the district court's Pickering balancing analysis? No, Your Honor, it does not. But you're starting with the Mt. Healthy and qualified immunity? Yes, Your Honor. With regard to Pickering balancing, just to make sure I understand, I'm having difficulty seeing, with regard to that defense, and maybe other defenses work better for your position, but I'm having difficulty seeing how the district court didn't err with regard to that because your client never claimed that he was relying on any disruption by virtue of the speech. So it seems sort of to the side of the proper analysis. So what am I missing? I think the concern that the district court was addressing, that was in May 2010, when we have this speech, Weinstein is both the director of the Innovation Accelerator and the assistant professor in residence. So the court was looking at what happened in May 2010 when we had this disruption. After when he was no longer director of the Innovation Accelerator, after July 28th, 2010, when he was an assistant professor in residence, there was no new disruption by Weinstein. You just had that history of him being a polarizing figure who exacted a price from Dean Early in terms of the morale and the function of the School of Business. And that is why the Mt. Healthy defense applies, even if this court, as it did in his prior decision, said Pickering favors Weinstein. The Mt. Healthy defense applies because we have a hiring freeze. There's no dispute by the plaintiff before the district court. There were some people who were hired? There were some people hired to fill essential positions. So there was essential positions. Vice Provost Bull said there was hiring for essential positions. The problem with giving Mr. Weinstein another position was there was no separate funding. There's no dispute that the position of directorship was conjoined. One salary of $130,000 for both the professor in residence and the directorship. So when you lost the directorship, there was no separate source of funding. And that is why Dean Early had testified, if I had to fill that, I could fill it with an adjunct who made under $6,000 a year, not pay this professor $130,000. So there was no funding available. And interestingly, Weinstein received that assistant professor in residence renewal June 8th of 2010 with the anticipation that he was going to get the directorship. When he didn't get the directorship, UConn scrambled to find funds that were on a one-time dispensation from the provost funds. There was no separate funding. So while some people in some positions were hired, there's testimony that it was only for limited positions. And they did eventually replace the director of the innovation accelerator, too. So the Mount Healthy defense favors the defendant because it's uncontested there were financial constraints on this position that had the assistant professorship could not be separated from the directorship position. Is that really uncontested? I mean, your adversary says, points to deposition testimony that people said, well, everything's all one pot. You can go back. Maybe there was no line, but you could go back to the provost and do what you did the preceding year, get more money specially allocated. That's speculative. But if you actually look at what was even said in the prior Second Circuit briefing, Weinstein admitted these were conjoined positions. They had one job description, one salary. One, I guess, could always ask the provost, do you have any extra money to give us? Were there not people who were hired or sought to be hired to teach those courses eventually? They did seek to hire people to teach them, but at a much lower rate. You're not talking about people who are being paid at the rate of $130,000. It's not about the freeze now. It's about the rate. The people who were hired were not hired for anything more than teaching a course, Your Honor. There's a big difference between hiring an adjunct and hiring a professor in order to have the benefit of health insurance and all of the other costs that go along with having a State employee. Were there not money ultimately found to fill those positions? But you're saying it's just a lower rate. That's why they were filled. I'm saying that they were not regular State employees. They were on a limited contract for a course, as opposed to being hired for a permanent State employee position. Why don't you move to your qualified immunity? Sure. In regard to the qualified immunity, it's important to focus on this speech here was in 2010, well before Lane, and after many decisions addressing qualified immunity by this Court and public employees. In addition to Weintraub, which is the case most on point with the internal labor grievance and no relevant citizen analog, we have Lew v. Austin, the president of the University of Connecticut, that found in favor of President Austin for not renewing an employee who was on a year-to-year contract. We have Barclay v. Michelsky, another State employee for Connecticut who reported mistreatment of mental health patients and people sleeping on duty. Paola v. Spada, another 2010 case from the Second Circuit, affirming that a State trooper who filed written complaints about unlawful conduct and mismanagement was engaged only in employee speech. Matthews v. Connecticut Department of Public Safety, another 2010 case where corruption by the State police was reported, and that wasn't protected speech. It was employee speech. Yes, Your Honor, because the existing law at the time certainly would not have put anyone in the position of Dean Early unnoticed that his conduct in not reappointing Weinstein could be considered against the law. Weinstein – I'm sorry, Early could have believed and did believe this was unprotected employee speech and that he had the right not to reappoint Weinstein. Sotomayor, this is focusing on the internal labor grievance, correct? Even the speech made in the nepotism complaint was done through the school of business and internal channels. So, yes, Judge Edgerton did conclude it was of limited public concern and it didn't affect a number of people and of limited concern of the public fist, but there would be no reason for Dean Early to think in 2010 that communicating only internally at UConn with the audit compliance attorney, Rochelle Rubin, through an email was anything more than the continuing conversation they've been having in March, April, and May about the programs within the school of business and especially the accelerator program. So, if we were to view this as a form of whistleblowing, you're saying that there was nothing that clearly established that it was a violation of law to retaliate against a whistleblower, even in the university context? No, Your Honor. What I'm saying is it would not be clear to Dean Early that this would be whistleblowing. He raised parenthetically a concern about nepotism that had been addressed before by the university and that others had raised. The adversary is asking us to look at it the other way, with the nepotism as the dog and the grievance as the tail wagging the dog. And if we were to look at it that way, then why wouldn't it be clearly established that it's, at some level, as the district court determined, protected speech, that the university couldn't retaliate against him for engaging him? It was speech on a public concern, Your Honor, but since it was made as an employee, Dean Early could certainly have thought that it was made as part of his duties at the school of business. This is well before Lane v. Franks. This is when we have Garcetti and all of these other decisions saying, even though I'm talking about public corruption with the State police, even though I'm talking about mistreatment of mental health patients, this is still employee speech and not something that is protected by the First Amendment. So I know that we can and sometimes do deal with these qualified immunity issues in the first instance, but here the district court didn't deal with them, didn't address that issue. Is that right? You're correct, Your Honor. He did in the original decision, but the court did not address qualified immunity in this instance. You're absolutely correct. He decided it on the Mount Healthy defense. So if we were to pursue this avenue that you're asking us to pursue, this is your first argument, why isn't it better to just remand to let the able and experienced district court judge deal with it? Because I think it's clear from this and the record before you that there's absolutely no question that qualified immunity would again apply just as it did in regard to the directorship position, and that this court may make that determination as an alternative ground for affirmance, although the defendants urge you to decide based upon the Mount Healthy defense, and we rely on our brief. Thank you. I'm going to jump around to various issues, but if Your Honors have any additional questions for me that I didn't have an opportunity to address during the first portion of my argument, obviously feel free to let me know. With respect to the initial May 2010 protected speech that the plaintiff communicated to the Director of Compliance, the Compliance Office, any that's not limited to employee complaints. It's very clear from the record that any individual has the ability to communicate concerns to the Compliance Office. And in fact, once the plaintiff did that, those concerns were escalated to an independent State agency, the State Ethics Office, that resulted in a memorandum of understanding being executed as dean early as one of the counterparties. So it's our understanding that the defendants had years ago decided not to contest whether the underlying protected speech initially found in the district court's initial summary judgment ruling prior to the first appeal decided not to challenge that protected status. It wasn't argued in the underlying summary judgment motion that resulted in the district court's second summary judgment ruling, and I didn't understand it to be challenged as part of the defendant's brief. So we believe that the underlying protected speech by the plaintiff in May of 2010 is well outside the scope of Garcetti. It's protected by the First Amendment. It's protected speech. Roberts. Did you address the Mount Healthy? Yes. So with respect to the Mount Healthy test, we think that the district court made a number of errors, both legal and factual. In the district court's ruling, the district court advanced an argument that I don't believe defendant Early actually advanced relating to disruption in the record. Well, that's the pickering. But she made a point about they could not afford to fill, to have him fill that position, the assistant professor position, because of hiring freeze. And so what they found were people who were not regular employees of the university and who could be paid at a substantially lower rate or a materially lower rate to fill that position. Your Honor, we believe that those facts are not established in the defendant's favor, and they have not satisfied their burden of demonstrating those facts. And I'm happy to walk you through some citations to the record that supports our position. So in Vice Provost Bull's response to the second step of the grievance, which is at page 953 of the record, one of the claims made is that the courses that Professor Weinstein was assigned to teach in the 2010-2011 year were all electives, rather than required courses. That's not actually true. If you look at the record, the truth is that the plaintiff was teaching required courses. That's not her point. So what's the next thing? Okay. The next one is that the management courses were not in high demand as other disciplines, so refilling the management positions in a very limited way could be a problem. And that's also at 953. The truth is that the plaintiff's courses were in high demand, that the department had highlighted the need to hire management faculty, and there's a disputed fact as to whether the author or the source of that information. And those points can be found at page 1069 of the record. What about the payment point and the amount that it cost the university to pay for this position? Okay. And with respect to that, we believe that there's ample evidence in the record to create a disputed issue of fact that supports an inference in favor of us. So if you look at page 1070 of the record, there's evidence that funding was available and other people were hired. If you look at page 1261 of the record, that there's evidence that other people and other APIR was recruited in the plaintiff's area. And specifically relating to the funding, if you look at page 2283 and then 2291 of the record, there's a table. If you look at 2291 of the record, there's a table that shows school of business faculty hiring in 2011 and 2012. And the first table identifies instructors in residence, assistant professors, assistant and residence professors in the school of business. And that group of professors is almost $1.7 million. In the second portion of that table on page 2291, there's other faculty hired that exceed $2 million. And so we believe that contrary to opposing counsel's argument that the school of business only was not hiring adjunct faculty at $6,000 a course, they were hiring people well in excess of $100,000 a year. And we respectfully submit that the Mount Healthy defense was erroneously decided in the defendant's favor, and the district court failed to hold the defendant to the proper burden of proof and ignored record evidence demonstrating factual issues that should have resulted in inference being made in favor of the plaintiff, as this court did in Smith v. Mount Suffolk, I believe was the name of the case. Okay, anything further? Thank you.